UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

GOPRO, INC.,

    Plaintiff,

v.

360HEROS, INC.,

    Defendant.

Case No. 16-cv-01944-SI

**ORDER RE: CLAIM CONSTRUCTION**

Re: Dkt. No. 51

## BACKGROUND

Plaintiff GoPro, Inc. ("GoPro") filed this trademark and copyright infringement suit on April 13, 2016. Compl. (Dkt. No. 1). Defendant 360Heros, Inc. ("360Heros") filed a counterclaim for patent infringement, asserting that GoPro directly or indirectly infringes U.S. Patent No. 9,152,019 (the "'019 patent"). Dkt. No. 25.

The '019 patent, entitled "360 Degree Camera Mount and Related Photographic and Video System," was issued on October 6, 2015 to 360 Heros, Inc. The patent teaches a portable mounting assembly for multiple cameras, which enables a user to attach cameras into a spherical, cubical, or other orientation. *See* '019 patent, Abstract. The invention enables users to capture images that they can stitch together to create, for example, a 360 degree composite image or a 360 degree by 180 degree spherical image. *See id.* The '019 patent purportedly improves upon prior art by, among other things, enabling users to attach and remove cameras without requiring partial camera disassembly or the use of tools, and by permitting cameras to be arranged in adjustable orientations. *See id.* at 2:38-58.

On June 1, 2017, the Court held a *Markman* hearing regarding disputed claim terms in the '019 patent. Having considered the arguments of counsel and the papers submitted, the Court construes the disputed claim terms as discussed below.

**LEGAL STANDARD**

Claim construction is a matter of law. *Markman v. Westview Instr., Inc.*, 517 U.S. 370, 372 (1996). Terms contained in claims are "generally given their ordinary and customary meaning." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312. In determining the proper construction of a claim, a court begins with the intrinsic evidence of record, consisting of the claim language, the patent specification, and, if in evidence, the prosecution history. *Id.* at 1313; *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996). "The appropriate starting point . . . is always with the language of the asserted claim itself." *Comark Communications, Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998); *see also Abtox, Inc. v. Exitron Corp.*, 122 F.3d 1019, 1023 (Fed. Cir. 1997).

Accordingly, although claims speak to those skilled in the art, claim terms are construed in light of their ordinary and accustomed meaning, unless examination of the specification, prosecution history, and other claims indicates that the inventor intended otherwise. *See Electro Medical Systems, S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1053 (Fed. Cir. 1994). The written description can provide guidance as to the meaning of the claims, thereby dictating the manner in which the claims are to be construed, even if the guidance is not provided in explicit definitional format. *SciMed Life Systems, Inc. v. Advanced Cardiovascular Systems, Inc.*, 242 F.3d 1337, 1344 (Fed. Cir. 2001). In other words, the specification may define claim terms "by implication" such that the meaning may be "found in or ascertained by a reading of the patent documents." *Vitronics*, 90 F.3d at 1582, 1584 n.6.

In addition, the claims must be read in view of the specification. *Markman v. Westview Instr., Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995), *aff'd*, 517 U.S. 370 (1996). Although claims are interpreted in light of the specification, this "does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957 (Fed. Cir. 1983). For instance, limitations from a preferred embodiment described in the specification generally should not be read into the claim language. *See Comark*, 156 F.3d at 1187.

However, it is a fundamental rule that "claims must be construed so as to be consistent with the specification." *Phillips*, 415 F.3d at 1316 (citing *Merck & Co., Inc. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003). Therefore, if the specification reveals an intentional disclaimer or disavowal of claim scope, the claims must be read consistently with that limitation. *Id.*

Finally, the Court may consider the prosecution history of the patent, if in evidence. *Markman*, 52 F.3d at 980. The prosecution history limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution. *See Southwall Technologies, Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). In most situations, analysis of this intrinsic evidence alone will resolve claim construction disputes. *See Vitronics*, 90 F.3d at 1583.

Courts should not rely on extrinsic evidence in claim construction to contradict the meaning of claims discernable from examination of the claims, the written description, and the prosecution history. *See Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1308 (Fed. Cir. 1999) (citing *Vitronics*, 90 F.3d at 1583). However, it is entirely appropriate "for a court to consult trustworthy extrinsic evidence to ensure that the claim construction it is tending to from the patent file is not inconsistent with clearly expressed, plainly apposite, and widely held understandings in the pertinent technical field." *Id.* Extrinsic evidence "consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises." *Phillips*, 415 F.3d at 1317. All extrinsic evidence should be evaluated in light of the intrinsic evidence. *Id.* at 1319.

**DISCUSSION**

Relevant for purposes of the Court's *Markman* analysis, the '019 patent claims the following:

> **Claim 1.** A holding assembly configured to releasably retain a plurality of photographic cameras in a predetermined orientation, said holding assembly comprising:
> a **support** including a **support body** having a plurality of **support arms** extending outwardly and radially from the **support body**; and

3

      each of the **support arms** including a **receptacle** disposed thereon and in which a plurality of the **receptacles** are disposed radially about the exterior of said **support body**, each of said **receptacles** defining an **open-ended enclosure** having at least one **latching feature** for enabling a photographic camera to be releasably retained within the defined enclosure wherein the **receptacles** are oriented about said **support** such that each retained camera provides an overlapping field of view, the cameras being disposed on the **support** to create either a 360 degree by 180 degree full spherical composite image or a 360 degree composite image.

**Claim 15.** A method for manufacture of a holding assembly that enables capture of 360 degree photographic or video images of a scene of interest, said method comprising:
    providing a **support** for said holding assembly comprising a center **support body** having a plurality of outwardly extending **support arms**, including a corresponding plurality of **receptacles** arranged on each extending **support arm**, each said **receptacle** defining an **open-ended enclosure** that is sized for releasably receiving at least one photographic camera body and in which each said **receptacle** is disposed in a specific angular or spherical orientation relative to each other to enable a 360 degree by 180 degree full spherical composite image or a 360 degree composite image to be created by the retained photographic cameras; and
    configuring each **receptacle** with a **latching feature** to enable a photographic camera body to be releasably secured within the **support** without requiring tools.

**Claim 22.** A system for creating 360 degree images of a scene of interest, the system comprising:
    a holding assembly configured to releasably retain a plurality of cameras in a predetermined orientation, the holding assembly comprising:
        a supporting frame defined by a center **support** and a plurality of **support arms** outwardly extending from the center **support**;
        a plurality of **receptacles** disposed about the exterior of the supporting frame, each of said **receptacles** provided on a corresponding **support arm** and defining a receiving cavity sized to accommodate a camera and including a **latching feature** for releasably and individually retaining a photographic camera within the **receptacle** and wherein the **receptacles** are oriented about said supporting frame such that each camera, when loaded into the **receptacles** provides an overlapping field of view, the cameras being disposed to create a 360 degree by 180 degree full spherical composite image or a 360 degree composite image.

**Claim 30.** A holding fixture configured to retain a plurality of photographic cameras in a predetermined orientation, the holding fixture comprising:
    a **support** including a center **support body** and a plurality of **support arms** outwardly and radially extending from the **support body**; and
    a plurality of **receptacles** disposed about the exterior of the **support** and at the extending ends of each **support arm**, each of the **receptacles** defining an **open-end enclosure** sized for retaining a photographic camera and in which the **receptacles** are oriented about the **support** such that each retained photographic camera provides an overlapping field of view, the cameras being disposed such that a centerline of the lens barrel of each retained camera is configured to intersect at a common center apex to enable either a 360 degree by 180 degree full spherical composite image or a 360 degree composite image to be created.

'019 patent at 22:24-41, 23:15-32, 23:50-24:4, 24:23-40 (the construction of the bold-underlined terms is disputed by the parties).

## I. Support Terms

The parties dispute the construction of three, related terms:

| Claim Language | 360Heros' Proposed Construction | GoPro's Proposed Construction |
|---|---|---|
| **"support"** | Ordinary meaning or "structure that holds or positions something" | "device that bears the entire weight of components disposed on that device" |
| **"support arm(s)"** | "structure that holds or supports" | "arms that bear the entire weight of the components thereon" |
| **"support body"** | Ordinary meaning or "structure that holds, supports or positions something" | "body that bears the entire weight of the components thereon" |

/ / / / / /

/ / / / / /

### A. "Support"

The parties first dispute the construction of the term "support." 360Heros proposes either no construction or "structure that holds or positions something," whereas GoPro proposes a construction that requires the support to "bear[] the entire weight of components."

In short, GoPro seeks to read in a limitation that the support, support arms, and support body "bear[] the entire weight of the components thereon," relying on attorney argument and non-technical dictionary definitions, without necessary corroboration from the intrinsic record. GoPro argues that because the camera rig would "fall apart" if the support features do not bear the entire weight of the components thereon, the Court should read in a limitation that the "support" bears the entire weight of components being supported. The Court will not read in such a limitation. While there is certainly some logic to GoPro's argument, limitations based on logic alone – without intrinsic support – are unnecessary.

360Heros, on the other hand, proposes a construction that simply clarifies the term "support" in the context of the '019 patent. Because a straightforward construction of the term "support" will aid the jury in its understanding that the "support" is a structure consisting of a "support body" and "a plurality of support arms," the Court will adopt 360Heros' construction of "support" as a "structure that holds or positions something."

### B. "Support Arm(s)" and "Support Body"

With respect to the terms "support arm(s)" and "support body," GoPro once again seeks to read in the limitation that these structures "bear[] the entire weight of the components thereon." As set forth above, this limitation lacks support from the intrinsic record. The Court will not construe these terms in a manner that includes this limitation.

360Heros, on the other hand, proposes constructions "structure that holds or supports" and "structure that holds, supports or positions something," which read out the term "arm(s)" and "body" from the claims. Such a reading is improper given that the "support body" and "support arm(s)" are distinct components. Indeed, the prosecution history reflects that the claims were drafted to emphasize the existence of a central support body with a plurality of outwardly and

radially extending support arms. *See* Bilinski Decl. (Dkt. No. 51-3) ¶¶ 10-13.[1] The Court will not construe the terms in a manner that blurs their distinct meaning.

Having construed the term "support" above as "structure that holds or positions something," the Court finds that the two remaining support terms need no construction. Neither "support arm(s)" nor "support body" is inherently unclear. Claim 1, for example, would now read, "[S]aid holding assembly comprising: [¶] a [structure that holds or positions something] including a support body having a plurality of support arms extending outwardly and radially from the support body . . . ." Indulging the "'heavy presumption' that a claim term carries its ordinary and customary meaning," the Court will adopt neither party's proposed construction. *See Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002); *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). These non-technical terms require no construction and do not pose a significant risk of juror confusion.

For the reasons stated in subsections A and B above, the Court construes "support" to mean "structure that holds or positions something"; and "support arm(s)" and "support body" according to their plain meaning.

## II. "Latching Feature"

| Claim Language | 360Heros' Proposed Construction | GoPro's Proposed Construction |
|---|---|---|
| **"latching feature"** | "structural element for securement and release" | "lever with a tab portion that mates with a slot; both lever and slot on the same receptacle" |

GoPro argues that the "latching feature" disclosed in the '019 patent should be limited to a "lever with a tab portion that mates with a slot." GoPro asserts that the figures in the '019 patent

---

[1] The Court declines GoPro's invitation to strike the declarations of Mr. Bilinski and Dr. King submitted in support of 360Heros' proposed constructions. *See* Opp'n (Dkt. No. 55) at 23-25. The Court is mindful that extrinsic evidence should not be relied upon to contradict the intrinsic record, but GoPro cites no compelling reason to strike the evidence in its entirety. *See Pitney Bowes*, 182 F.3d at 1308; *Phillips*, 415 F.3d at 1319. GoPro raises valid concerns as to the probative value of these declarations; however, GoPro's request to strike the Bilinski and King declarations is DENIED.

and corresponding descriptions in the specification support its proposed limitation because each illustrated embodiment includes the same type of "latching feature" -- namely, one that contains a lever, tab, and slot. *See* Opp'n at 16-17. GoPro points to Figs. 1(e), 4(g) and others as portraying a "latching feature" that includes an integral engagement latch, a tab portion, and a slot. *See id.* at 17. Accordingly, GoPro argues that a "more tailored construction for 'latching feature'" is required. *See id.*

Indeed, the specification does reference the type of "latching feature" GoPro focuses on. Multiple preferred embodiments describe such a latching feature. *See* '019 patent at 7:63-67; 9:27-31; 10:28-33; 10:39-43; 11:26-32. However, the tab-and-slot combination is not the only "latching feature" disclosed in the specification. The brief description states that "the plurality of retained cameras snap into various receptacles that are defined in the holder assembly that accommodate each camera based on an interference or snap fit, enabling easy removal." *Id.* at 3:3-6. GoPro disregards disclosed embodiments that employ the so-called "interference fit," which is a different type of latching feature than the one GoPro identifies. GoPro ignores, for example, Figs. 5(a)-(h) & 6(g), and the corresponding written descriptions, which depict a latching feature that employs an "interference fit." *See, e.g.*, *id.* at 12:21-29 & Figs. 5(a)-5(h), 13:42-47 & Fig. 6(g). The interference fit does not include a lever, tab, or slot. *See id.* GoPro's proposed construction of "latching feature" improperly limits the term to one embodiment. *See Phillips*, 415 F.3d at 1316 ("[C]laims must be construed so as to be consistent with the specification." (citing *Merck*, 347 F.3d at 1371)); *Comark*, 156 F.3d at 1187 (citation and internal quotation marks omitted) ("Although the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims.").

In addition, GoPro argues that the prosecution history supports its proposed limitation. The prosecution history demonstrates that the latching feature was emphasized in order to distinguish prior art, U.S. Pat. App. Pub. No. 2013/0201296 ("Weiss"), which required hard-wiring cameras to mounting surfaces and using screws or fasteners to secure the cameras. Bilinski Decl. ¶ 4. The '019 patent discloses a holding assembly that permits photographic cameras,

8

without any disassembly, tools, or screws, to be "releasably retained" in an open-ended enclosure utilizing at least one latching feature. *See, e.g.*, '019 patent at 22:30-36; *see also* Bilinski Decl. ¶ 4. The prosecution history necessarily disclaims systems like Weiss that prevent the attachment or release of a camera without tools, screws, or similar. But in no way does the prosecution history limit the disclosed "latching feature" to a particular embodiment.

For the reasons stated above, the Court construes "latching feature" to mean "structural element for securement and release."

### III. "Receptacle(s)"

| Claim Language | 360Heros' Proposed Construction | GoPro's Proposed Construction |
|---|---|---|
| "receptacle(s)" | Ordinary meaning or "structure to receive or hold something" | "a container with a cavity sized to surround and contact the camera" |

GoPro argues that the claim language, figures, and specification support its narrower reading of "receptacle(s)." In so arguing, GoPro once again reads limitations from preferred embodiments into its proposed construction. *See Comark*, 156 F.3d at 1187.

Although certain embodiments may teach a receptacle that "surround[s] and contact[s] the camera," others clearly do not. The patent's brief description describes the "receptacle" as "a retaining cavity that is sized to retain a camera." *See* '019 patent at 2:4-5. A receptacle that "retain[s] a camera" need not "surround and contact the camera." In one preferred embodiment, the '019 patent describes a "receptacle" as "an enclosure having an interior that is sized to receive a photographic camera." *See* '019 patent at 7:29-30. While this embodiment discloses a receptacle with "an open end 126, a top wall 132, an inner side wall 134 and an outer side wall 136 that is substantially parallel to the inner side wall 134[,]" it does not support a reading that the receptacle must "surround" the camera. *Id.* at 7:35-38. In all disclosed embodiments and in the patent claims, the purpose of the "receptacle" is to receive and hold a camera in place.

GoPro further argues that the prosecution history supports its construction. GoPro argues, without explanation, that by distinguishing prior art that required hard-wiring a camera to a mounting surface rather than releasably securing the camera to a receptacle utilizing a latching feature, 360Heros somehow limited the scope of the '019 patent to receptacles that are "sized to surround and contact the camera." The Court disagrees. As set forth above, the prosecution history GoPro cites to merely disclaimed systems like Weiss, which prevented easy attachment or release of a camera without tools or partial disassembly.

For the reasons stated above, the Court construes "receptacle(s)" to mean "structure(s) to receive and hold a camera in place."

## IV. Enclosure Terms

Lastly, the parties dispute the construction of two, nearly identical terms:

| Claim Language | 360Heros' Proposed Construction | GoPro's Proposed Construction |
| --- | --- | --- |
| **"open-ended enclosure"** | Ordinary meaning or "open structure to hold or retain something" | "structure with contiguous walls that surround and contact the camera" |
| **"open-end enclosure"** | Ordinary meaning or "structure at least partially open to hold or retain something" | |

As an initial matter, the Court will not construe these two terms separately simply because one is an "open-ended enclosure" and one is an "open-end enclosure." The two terms describe the same structure within the claimed invention.

GoPro correctly observes that, "[b]y definition, an 'open-ended enclosure' is an enclosure with an open end." Responsive Br. at 21:16. Nothing in the claims, specification, or prosecution history requires the enclosure to have, in all instances, "contiguous walls that surround" the camera. The "open-ended enclosure" disclosed in the '019 patent, with its accompanying "latching feature," comprise the "receptacle," which serves to "releasably retain" a camera. '019

10

1  patent at 22:33-36. Including the relevant constructions set forth above, claim 1, for example,
2  would now read: ". . . each of said [structures to receive and hold a camera in place] defining an
3  open-ended enclosure having at least one [structural element for securement and release] for
4  enabling a photographic camera to be releasably retained within the defined enclosure . . . ."

As it appears in the claim language, "open-ended enclosure" is not unclear or ambiguous on its own. Construing "open-ended enclosure" at this point would not clarify the term's meaning or help a jury understand the asserted claims. As such, the Court hereby construes "open-ended enclosure" or "open-end enclosure" according to their plain meaning.

## CONCLUSION

For the foregoing reasons and for good cause shown, the Court hereby adopts the constructions set forth in this order.

This order resolves Dkt. No. 51.

**IT IS SO ORDERED**.

Dated:

_____
SUSAN ILLSTON
United States District Judge